Your honors, good morning. May it please the court, my name is Tim Scott and I represent the appellant Mr. Ramirez-Escada. With the court's permission, I'd like to address the warrantless search and entry of Unit 3, which was the address that was resided in by Ms. Sullivan's client, Mr. Reyes-Bosque, and in which my client, Mr. Ramirez-Escada, was an overnight guest. I'm always getting these numbers mixed up, so 3 is where the woman was and 4 is where the aliens were? Correct, correct. As a matter of this court's precedence, and this has been true since the en banc decision of Windsor in 1988, it is a search and a Fourth Amendment violation for agents to command that a door be opened under a show of legal authority. To be clear, it is permissible to do what the government describes as a knock and talk. There is certainly nothing wrong with an agent coming up and knocking on the door to see if the person inside will answer and have a consensual encounter. But it is equally true that the person who is inside, whose home it is, has the same right to respectfully define, either through words or actions, and to not participate in the knock and talk. What made this forceful as against a consensual opening? It became a nonconsensual opening when officers used their authority, or when the officer used his claim of authority and said, Border Patrol, open the door. What the record reveals, and this is on page 184, 183 to 184 of the ER, is the agent began by simply knocking. But it didn't work. He heard a deadbolt click and perceived that the persons on the other side did not wish to interact with him. Did the deadbolt click mean that it was being locked, or can you tell? He said he couldn't tell if it locked or unlocked, but he was also clear that he perceived them to be not wanting to talk to him. And it was at that point that he escalated it from the knock and talk that is permissible to a nonconsensual entry by saying, Border Patrol, open the door. Could I ask you just a threshold question? I was stumbling over the question of standing. Silva says that a bald assertion that I am an overnight guest is not enough. And in looking through the record, I didn't see much more than that. So what's the evidence that Mr. Ramirez did have a reasonable expectation of privacy in Unit 3, other than his, you know, I think in his confession and his declaration? Well, he was present the night before by his own statement. And the court is correct that one may not necessarily credit a statement that someone was simply present that day or had been the night before. The government points to evidence that he was actually participating, that he was on the site the night before. The record does show that he is not from that area, that he is from Pasadena, actually, from East Pasadena. And ultimately, I think the analysis becomes that the district court at least implicitly made a finding that he was an overnight guest and that he was entitled to a legitimate expectation of privacy. The reason I say that the district court implicitly made that finding is that the court took great care to find that Mr. Rivas-Posos, Mr. Reyes, and Mr. Ramirez, my client, each lacked standing in Unit 4. And so the court was making this analysis and was careful to decide whether or not somebody did have a reasonable expectation of privacy. And the fact is the district court did proceed with a full analysis as to Unit 3 and didn't make any findings that he lacked standing. Was that raised by the prosecution, the fact that he didn't have standing? It wasn't. And what I was going to say is it's a little, I would respectfully suggest, unfair to say to Mr. Ramirez, why isn't there more in the record about standing when this is something that the prosecutor didn't raise earlier? It's not accurate to say that the prosecutor didn't raise this because, or is now raising it because of evidence that was adduced at trial. The prosecutor also had the opportunity during new rounds of supplemental briefing and a re-raised motion to suppress evidence, to address the concerns that it now says arose at trial. So this is something that would have been, there would be more of a record had it been raised below, and that's when I think the sure win is the Lotro case. And now cases say it shouldn't, in order to the detriment of the person who is asserting standing, what may or may not be in the record based on it not being raised by the prosecutor below. So it's sort of an issue of fairness. So do we have, are we relieved of an obligation of determining standing? I know there are some cases that say it doesn't matter because the defendant has an obligation to show the reasonable expectation of privacy, and even at the appellate level we need to reach it. Or can we say we're relieved of that obligation? I think the court can say that it's relieved of that obligation under the sure win. It's below Lotro in the line of cases that I cited. I would acknowledge there appears to be some authority to go either way. It is our burden initially. It's a burden that I submit we met at the district court level and that the district court implicitly found. But it certainly. Well, in this case, I would think if it were, if there were factual matters, they should be raised below. That's right. But at the end of the day, they would. If it's a legal conclusion and the Supreme Court comes down with a case before the appeal that says that people in this situation don't have standing, I guess you could decide. Right. So the facts in the record are the ones that you stated a few minutes ago. Correct. We submitted a written declaration which went unchallenged. There was no dispute about it. And then I have also pointed in the record to what the government relies heavily upon, which is Mr. Ramirez-Esteva's confession that he stayed overnight. So this isn't a factual dispute where the government denies that he stayed overnight the night before. In fact, it's part of the government's case that he was allegedly scouting the checkpoint. And in the midst of confessing to that activity, he also explains to the agents that he was resting there and that he had stayed overnight. So I don't think the government would contest that he actually did spend the night before there at the residence. Their argument goes to the purpose of his visit, which this Court has addressed in Gámez or Duño, which says that overnight guest status alone confers standing, whether or not the person was there for criminal activity or other activity. It's the act of being an overnight guest of an identifiable host that results in a legitimate expectation of privacy. I didn't see the overnight guest piece, I guess. I mean, Silva says you can't just do a bare assertion and then the government cites cases saying, well, if you're there just for commercial purposes and here, and they argue, well, he rested there. That's what he said in the confession. I just can't say or anything. Rested there, but then just hopped out and back and forth looking at the checkpoint. The supplemental excerpts of record at 98 is where he gives what the government describes as a confession, and it describes both resting but also staying the night. These were questions that were asked by the agent. And again, I would take issue with it being a bare assertion because generally the cases that have sort of looked down on a bare assertion have done so because the government contested it and the government disputed it at the district court level, which never occurred here. Okay. Time is flying by. So let me ask you to explain a little bit if there was, if the search of the Apartment 4 was okay and there was evidence that the person in charge was in Apartment 3, why wasn't the search of Apartment 3 okay? Because there was no evidence at the time that agents commanded entry into Unit 3 that anything was going on in Unit 3. And, in fact, the agent on cross-examination admitted that he had no reason to believe that anyone inside Unit 3 was conducting any criminal activity or that there were any persons, the illegal aliens in this case, were inside Unit 3. What the record is clear about is that agents simply wanted to either verify or what they describe as collaborate, but I think agent meant corroborate, the assertion of Mr. Rivas-Posos as to whether or not he was staying there. It was purely investigative in purpose, and there was no perceived emergency. Well, somebody identified Rivas-Posos, isn't that correct? As the caretaker. They said that's the guy who's taking care of this place. That's the caretaker. Correct. And he said his godfather was in there. That was his story. Rivas-Posos said that, so they knocked on the door. That's right. That's right. That was his story. The agents didn't necessarily believe that story. They wanted to either confirm or refute it, so it was investigative in purpose when they went to Unit 3. Well, if he had said I've rented Unit 3 and it's okay to go in there, that would have been something different. Certainly. Certainly. But he didn't say that. I'm sorry? He didn't say that. He said his godfather was in there. Correct. He didn't claim to live there. He didn't claim to have authority to consent to the search, and he actually didn't consent to the search. He knocked on the door just as a visitor would. In my brief time, actually, I see that I'm now under 10 minutes. So what should they have done? Nothing? They should have left the scene? No. They could have attempted to apply for a warrant, although, as the district court repeatedly observed, there would not be probable cause to do so. Or they could have endeavored to do the knock and talk that this case started as, although the persons on the other side of the door were within their rights to decline to participate. Or they could have, I suppose, staked out the area, waited for somebody to come back. They could have waited for somebody to come outside and then talk to the person or follow it up in that manner. Your goal is to suppress the statement made by your client. Correct. Subsequent to that. There wasn't anything found, actually. No, no. You're three except him. No tangible evidence or physical evidence attributable to Mr. Ramirez, but he did give the alleged statement in the driveway, which ought to be suppressed, as well as the subsequent statement at the station house, which was also proof of that initial entry. I don't want to take time for Ms. Sullivan, so I will submit. Thank you, Your Honors. Good morning, Your Honors. May it please the Court, Holly Sullivan on behalf of Mr. Reyes Bosque. The presence of exigent circumstances implies that there is insufficient time to obtain a warrant. When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real and immediate serious consequences. A supposed action is not to get a warrant. Here, officers made no attempt to obtain a warrant prior to going into either Unit 4 or Unit 3. Officers at that point had the lone person identified as the caretaker in their custody outside the units. There was no evidence that there was any immediate danger to either officers or anyone within either of those units. A warrant must have been required for that entry. As Mr. Scott stated, the open-the-door command and subsequent opening of the door of Unit 3 to that command was the search. It was not consent. Well, was there anything damaging out of Unit 3 that hurt your client? Yes. What was that? The search of Unit 3, in addition to having statements of Mr. Ramirez, the co-defendant, which implicated Mr. Reyes Bosque. In addition to that, the discovery of Mr. Reyes Bosque, which himself cannot be suppressed, but there were subsequent photo lineups that were created from the entry into Unit 3 and the witnesses that were in Unit 3. And those lineups would be a fruit of that illegal search. Additionally, we are already in the SSP. Excuse me. How was the photo lineup a fruit of the search? I didn't quite understand that. This Court has determined previously that when there are witnesses that are located as a result of an illegal search, and they were witnesses that would not have come forward on their own volition in order to answer questions of the agents, that that testimony would be a fruit of an illegal search. So here there's both Mr. Ramirez, the co-defendant, and statements that he made, and in addition, finding people within Mr. Ramirez, Ms. Guzman, Mr. Reyes Bosque's wife, and Mr. Reyes Bosque himself, the agents took photos of them and presented them in six-pack photo lineups to illegal aliens that were found. And that should be suppressed as a fruit of the illegal search. The photos? The photos should be suppressed? Is that your point? Yes. The photos. Yes. Additionally, the government argues that Mr. Reyes Bosque doesn't have standing to Unit 4, and that's relying on the district court stating that although there was some evidence that Mr. Reyes Bosque had paid rent on Unit 4, there was no evidence that he had paid rent at the time of the search. And that evidence was actually presented at trial, that in fact he did pay rent at the time of the search, and the landlord or the owner of 362 Wilson stated that. So the district court was relying on erroneous facts at the time. The receipts were made out to somebody else. That's correct. And the landlord testified that Mr. Reyes had asked for the receipts to be made out to another person, Juan Contreras. Well, if I paid the rent for somebody else but for somebody else's tenant, does that give me standing? It doesn't automatically give you standing, but it does have an expectation of privacy in that unit. In both the Huffines case and also the Johns case, they do look at an obligation or an ongoing obligation to pay rent, whether on a rental property or in a motel room. And the fact that there was an ongoing obligation to pay rent would give Mr. Reyes Bosque an expectation of privacy in that unit. The fact that the district court relied on was that there was no showing that Mr. Reyes Bosque had paid rent at that particular time, December of 2005, and that was shown at trial to be the case. The government also never argued exigent circumstances as to Unit 3. They argued that the entry into Unit 3 was based solely on consent and that the exigent circumstances were only as to Unit 4. So that was not argued before at the district court. That's a valid reason to go to Unit 4, though, if they had exigent circumstances, would it not? It would be if they did have those circumstances. Didn't one of those people say that there's a bunch of people in there that can't get out and they've been taken across the border or something? Is that affected? The statement, specifically the word, that the district court and the government continually relied on was the statement of one of the material witnesses who had said that they had escaped from the home. The evidence doesn't support that there was any hostage situation in that unit. The three material witnesses that first, or the three illegal aliens, that first led the agents to 362 Wilson, to that address, were discovered in downtown Raleigh. When agents began to approach those three individuals, they turned away from agents. Unlike other cases, they did not run towards agents. They did not ask for their help. They turned away from agents and proceeded to go into a market. After they were brought into the border patrol vehicle and questioned, one of them had said that she had escaped from the home. When they went to that home, if there was any exigent circumstances at that point, based solely on escape, at the time that they arrive at 362 Wilson, that same woman identifies Mr. Rivas as the caretaker and the one who made sure that no one left. He is now outside 362 Wilson, and agents approach him and talk to him at that point. Agents also wait over half an hour, I think it's about 20 minutes, at least 20 minutes if not more, waiting for backup to arrive. Even if exigent circumstances could have been seen from the woman illegal alien saying that she had escaped from that home, that time period, the wait for backup to arrive, having the lone caretaker in their custody, that it takes away from any strength to an exigent circumstances argument. At that point, agents could have called for a telephonic warrant. They could have surveilled that area. They could have surrounded the perimeter. They could have done many, many things other than violating the Fourth Amendment and going into Unix 3 and Unix 4. Additionally, the government argues that Mr. Rivas Bosque's Sixth Amendment rights were protected and that his counsel bore him no ill will. Surely the Sixth Amendment requires more than an attorney who doesn't bear ill will towards their client. Post-trial, Mr. Rivas Bosque submitted a letter to the court requesting that a point of counsel be in place, and a hearing was held on that matter. At the hearing, the court conducted a brief inquiry with Mr. Rivas Bosque in which Mr. Rivas Bosque said that his attorney did not visit him, that he believed he was ineffective, that he wished to testify at trial and was not allowed to. The court quizzed the lawyer about all that, did it not? He actually quizzed the lawyer about everything but not visiting him. And this is at the point 10 days prior to trial when a pre-sentence report has recommended a guideline range of 360 to life for Mr. Rivas Bosque on an alien smuggling harboring case, and no objection had been filed to that recommendation. In fact, previous to the sentencing, within, I believe it's five days prior to sentencing, Mr. Rivas Bosque's counsel had filed sentencing papers with no meaningful review, a few paragraphs saying that there were no mitigating circumstances, and agreeing to that base offense level in recommending the sentence of 15 years. Mr. Rivas Bosque had only one voice in that courtroom, and that was the voice of his attorney. He did what he was able to do in writing a letter to the court requesting a point of counsel. The district court seemed to punish him, did not even conduct an inquiry into whether or not he qualified for a point of counsel. Within a short span of time, at the time of sentencing, when the retained counsel had repeatedly stated that he did not believe he should be there, that there had been a breakdown in communication, and that he didn't feel that he should represent Mr. Rivas Bosque, and Mr. Rivas Bosque did not feel that he should be there on his behalf, the district court then referred the case to the magistrate in order to have counsel appointed for appeal. I see I'm out of time. Thank you, Your Honor. Thank you. May it please the Court, my name is Andrew Shopler on behalf of the United States. To prevail on their Fourth Amendment claims, defendant Ramirez must overcome six separate legal obstacles, and Mr. Reyes must overcome four or five, depending on which unit we're talking about. Now, I'm going to address why any one of those legal hurdles is fatal to their appeal. But I want the court during this discussion to keep in mind the fact that, as to Mr. Ramirez, the only evidence that's truly subject to suppression here is his first confession, not his second videotaped confession. And Mr. Reyes's convictions are fully supported without any of the physical evidence in this case. How much time expired between Ramirez's first statement and the one he made subsequent to that? It was a matter of hours. It was not an exact time in the record, but at least an hour and a half. Does that attenuate the taint, assuming that the first confession was? Assuming arguendo that the first confession was attained illegally, it's absolutely attenuated because the officer who received the first confession, Agent Perez, never conveyed to the officers who ended up interviewing Mr. Ramirez at the station house that this confession had ever occurred. The two agents who interviewed him at the station house testified they were not aware of the first confession. So this was not like Siebert, a two-step process to subvert Miranda. This was two agents who were given a suspect. They took him to the station house, interviewed him, and he confessed. Doesn't Taylor v. Alabama, though, doesn't that focus more on what the suspect is thinking, not really on whether the officers knew what the other officers knew? It says whether he felt that it was an act of free will, the confession. And Taylor seemed very close on point in saying no, that the taint wasn't attenuated. Well, I believe that both are relevant. Under Siebert, the court says the exception to ELSTAD is when the agents are intentionally trying to employ a two-step process to subvert Miranda. That's certainly not what happened here. And you're saying there's no evidence that they intentionally tried to interrogate him to let the cat out of the bag, then Miranda dies him. So that's not, assuming that's not on point. But what about Taylor v. Alabama in that line of cases? I believe that the evidence is very clear that the defendant here, Mr. Ramirez, did not have, his will was not overborne or anything of that nature. And I think the evidence of that starts with the fact that he was in there for approximately, he was interviewed by two different agents. The court made judicial findings that he was not treated in an abusive or threatening or domineering manner. The judicial findings with regard to all of the interactions with him at this scene are very favorable and suggest that this was not something that his will was overborne. Does that matter for purposes of Taylor, though? Because Taylor just says, well, he was arrested without probable cause, and then he confessed, and so we'll suppress that. It didn't seem to look into whether there was any overbearing of the will, necessarily. Well, since that precise point was not raised by a volunteer, what I would prefer to do is submit some 28-J authority on that particular issue, Your Honor, and I would be happy to address it in that manner. I would like to address the issue of standing with regard to Mr. Ramirez that the court discussed initially. The test here, well, first of all, whether it's been waived. I submitted a 28-J letter which listed seven cases other than Robertson, which I cited in my brief for the proposition that even when the government does not raise the issue of standing below, it remains the defendant's burden and we can raise it on appeal. The cases that – and there's, in fact, a Ninth Circuit case, Takeda, which distinguishes all three cases that Mr. Scott relied upon. Stigall was a Supreme Court case where the government adopted a contrary position. They said it was the defendant's house at the trial court, at the court of appeals, and in their brief to the Supreme Court opposing cert. And then in their merits brief, their reverse position said, well, the evidence isn't clear. It's his house. The Supreme Court says if you adopt a contrary position, we're not going to address the issue of standing. On the other two cases, as Takeda, this court, pointed out, those were cases where the government was appealing and, therefore, the government had the burden of proving that the trial court's suppression ruling was wrong. And they said in the case where it's the government's burden and the government's appealing, you can't raise it for the first time on appeal. In all the cases where the defense is the one appealing the suppression ruling and the government is responding, this court's precedent is clear that the government can raise it for the first time on appeal even if it wasn't raised below. So we have not waived it, and I would refer you to that 28-J letter. The test with regard to Mr. Ramirez is a social guest has standing, and someone who is paid to be there does not. Mr. Ramirez was being paid to be at that location. The evidence here is that by his own lips, he arrived the previous day, and he was being paid $250 to scout the checkpoint. The evidence shows that he was out most of the night scouting the checkpoint, and at Supplemental Life Service of Record 300, you have testimony that the group that was not able to cross the checkpoint came back as late as 3.30 a.m. We also have testimony that he was seen outside at 8.30 a.m. talking to the three aliens who ended up escaping. And at 10 a.m., the testimony of Mr. Ramirez's trial was that he was found hiding under the covers. The difference between this case and cases like Donna's or Gugno is one in Donna's or Gugno, the court found that the people were social guests. The host invited them there for food and recipes. He found them lost in the desert. In this case, he was not a social guest. He was someone who was being paid to be there. And both defendants were—Mr. Ramirez ignores Kunstler, which was a case I cited where the Eighth Circuit said that two defendants who had been at the owner's house for several weeks might not have standing, where they were there to set up a methamphetamine lab in the attic. And they remained there in the district court for further factual findings. But they said even though they'd been there several weeks, and for one defendant it was months, they said if he's there to set up a methamphetamine lab, standing is an issue. So— Is the idea if you're there for some illegal purpose that they don't have standing? Yes. Or is it more than that? Yes. Well, I think it's less than that. The court has said if you're there for a purely business transaction, or if your purpose there is commercial, that you don't have standing. And I think, for example, in Carter, where it was not simply business but illegal business, your standing argument is even weaker as a defendant. So I would like to move on to the issue of the emergency doctrine in this case. The court below found that a hostage situation was likely. And he found that that hostage situation, which justified the search at Unit 4, the stash house, those same facts supported a search at Unit 3, Mr. Reyes's residence. And that factual finding was reviewed for clear error. There is certainly enough evidence in the record to support the fact that the agents reasonably believed they were dealing with a hostage situation. And I think in evaluating whether their decision to conduct knock-and-talks at each residence was reasonable, this court has to evaluate that from the standpoint of lives hanging in the balance. Because the next police officers who are dealing with a hostage situation are going to have to deal with this standard. And certainly if any of us had a child who was being held hostage, and police were told hostages are being held at one residence, and then received some information saying the person who was holding them was staying in a residence right next door, 8 or 10 feet away, they would certainly be justified. They would have a reasonable basis for concluding that they should at least knock on the door and even say, police, come to the door. What was the best evidence that number 3 had somebody in there that was a hostage? The best evidence was that, well, first of all, I think that it was somewhat ambiguous as to which unit the alien was pointing out. She never said, we came from Unit 4. She was at the end of the driveway, and she said it's the one in the rear. Down at the end. Unit number 1 is definitely in the front, and then the complex that houses Units 2 and 3 and Unit 4, both back in the rear. So I think there was some ambiguity there, although they definitely assumed it was Unit 4. And so they split up. They sent two officers to Unit 4, this dash house, and one officer went with the godson or the apparent godson, Mr. Rivas-Pozos, to knock on the door at Unit 3. And the evidence, so in addition to that ambiguity, Mr. Rivas-Pozos, who had been identified as the person, one of the people holding the aliens, holding the people hostage, said he was staying at Unit 3. And I think when you have the captor saying he's staying in one apartment, which is right next to the place where you have the belief that hostages are being kept, the police have a reasonable basis to think that hostages may be at either location. And they're justified in investigating and certainly justified in knocking on the door. Did they know how many hostages there were? They said 20. That's what they were told. And these are both very small locations, so I think it's a reasonable inference that maybe they wouldn't all fit in Unit 4. And, in fact, there was an illegal alien in Unit 3, Mr. Rivas' wife. Moving on to the issue. She wasn't a hostage, right? She was not a hostage. She was not, no. Now, moving on to the issue of the knock and talk at Unit 3. I think you both have the issue of the apparent authority of the godson, or the apparent godson, who said he was staying at Unit 3. To the extent they didn't believe that, they thought he might have even more authority there because his license said that it had 362 Wilson on it. So he claimed on the godson. Had they read that? They had. Okay. I think the other side says there's no proof that the officer had read that on his license or something. Well, the testimony is clear that they asked him for identification. He handed it over. It said 362 Wilson. That's the reason he was suspicious. He said, I'm a godson visiting from El Centro. They looked at his license, and it said 362 Wilson, which is the address they're at. Did the officer say he looked at that and saw the address? Yes. He did. Okay. Well, I didn't understand the, if somebody has apparent authority to open the door, and he opens the door and you go in, then you've got an apparent authority argument. But all that Mr. Rubis poses did was knock and then said, well, I guess you're not home. So I don't see how that authority to knock on the door gives the officer's authority to command the door be open. How do you make that connection? Well, first, I think the fact that they're knocking on the door is a less intrusive means than simply opening the door. So I think that weighs in the government's favor here in terms of whether this is an unreasonable search. Secondly, he said as they were approaching the unit that they were, he thought that Mr. Reyes might be sleeping. So there was an expectation that people might not be prepared to have him come in and see them. So it's reasonable for him to knock. And then the court originally found there were several minutes before the door was answered. But at trial, at Mr. Ramirez's trial, Agent Perez clarified that by a minute or two, he meant five to 20 seconds. So it could have been in the light most favorable to the fact finder's decision here, which is the standard this court must apply with regard to the question of consent. I think it was a much shorter period of time that they were waiting at the door. And it was reasonable to knock if you think people might be sleeping inside and wait for them to get dressed or put on robes to come out to answer the door. The door clicks, suggesting that the deadbolt is either closing or opening, and then the door opens. And there was never any testimony that it clicked again. So I think the reasonable inference, and in the light most favorable to the fact finder's decision, the door clicked to open it. They prepared themselves and then opened the door. So, yeah. So how do you distinguish it from Windsor and Bautista, where we said if you say police, open the door, that's not consensual? Right. Well, first of all, the test for a consensual encounter is always the totality of the circumstances. Actually, my very first point, I think, is that one way this is distinguished from Windsor and Bautista is in those cases they use the phrase open the door. In this phrase, it's open the door or words to that effect. And in the light most favorable to the fact finder's decision, I think you have to focus on the words to that effect part of that. It could have been please open the door. It could have been can someone come to the door. It could have been anyone home. And the fact of the matter is the fact that Mr. Scott, who litigated Bautista, asks, did you say open the door or words to that effect? He may be thinking that open the door is the operative phrase. But when the agent responds, yes, we did, he's in the light most favorable to the fact finder's decision. He is thinking about the words to that effect because it doesn't make sense that both he and the godsend would be saying order patrol, open the door. What he's thinking of is that, you know, we said we asked someone to come to the door. We knocked and announced ourselves. So I think that distinguishes it from Windsor and Bautista, number one. Number two, in both of those cases, the totality of the circumstances indicated that the person who's opened the door had their will overborne. And in Windsor, the second they opened the door, four officers have guns in the guy's face. And it's clear from in that case they had the hotel surrounded and the police helicopter circling and they're opening every single other door that, as the sentencing judge in the case put it, you know, they knew they couldn't escape. In Bautista, the term open the door was irrelevant to the opinion because that officer actually entered. He had a key from the hotel manager and he put it in there and opened the door and he started to turn the handle simultaneously with the occupant opening it. Did he say anything? He said open the door in that case as well. But he's already inside? But it was simultaneous. He turned the key and then he was already opening the door. And then he showed after opening the door that he had an intent to come in no matter what by sticking his foot in the door to make sure it wouldn't close again. And that's a very important point, I think, in both those cases is that in both cases they crossed the threshold or manifested through the pointing of their guns or something that they were coming in no matter what. A case that I cited that the defendants did not address is Pagay versus Pagay, P-A-G-A-Y. And that's a case where the police came up to the door, knocked several times and announced police. And the people inside recognized it as police and somebody says the police better open up. The court found that that was a consensual encounter and the person who opened the door did not have their will overborne because, among other things, he did not cross the threshold. The person opened the door and he talked to the person respectfully. And I think that case is a wonderful case for the government because I think it's indistinguishable if someone knocks several times and says police or knocks several times and says police, open the door. It's a totality of the circumstances analysis and it should not be that whenever a defense counsel asks a witness, did you say open the door or words to that effect, that it automatically negates consent. It's always a totality of the circumstances analysis. And the judicial findings here were that Agent Perez was not acting threatening, abusive or domineering. His actions both before he knocked on the door and after he knocked on the door suggests that he was not trying to effect a warrantless entry in this case. Unlike Winsor, unlike Bautista, but very much like Havau versus Piguet. So I believe Winsor and Bautista should be distinguished by this court. And there is no automatic rule that saying the term open the door, even if that's what was said rather than words to that effect, automatically negates consent. I did want to address the argument regarding the third attorney, the request for a third attorney. That's an abusive discretion standard. And I did want to point out that I really, one thing that's curious about this to me is I don't see the prejudice that Mr. Reyes. When was the request? It was after trial? It was after trial, 10 days before sentencing. And there, Reyes has not disputed that his sentence, he's not challenging his sentence or suggesting anything could have been done differently. And in fact, I believe he received a much lower sentence than the guidelines, a strict calculation of the guidelines would suggest. So the court conducted a very thorough inquiry here. And I recommend that you read through it if you have any problems with this issue. And he followed up every single time the defendant gave an ambiguous answer. He followed up to get further information before making his decision. His biggest complaint was he wasn't visited in the jail enough or maybe not at all, right? I think that was the biggest complaint in the appellant's brief. But I don't know that that came through very well in the hearing. He did mention, I think he did mention the fact that he hadn't been visited enough. But they certainly had been seeing a lot of each other. They were together every day for two weeks during this trial. And then with regard to how many seconds? Well, I think I have 13 seconds. Oh, I am over, but. Yes. Yes. Thank you. Are there any further questions? Are there further questions of the appellant? Thank you. Matters just argued are submitted for decision. That concludes the Court's calendar for this morning, and the Court stands adjourned. All rise.
judges: Siler, Schroeder, Ikuta